T.C. Memo. 2011-29


UNITED STATES TAX COURT


DKD ENTERPRISES a.k.a. DKD ENTERPRISES, INC., ET AL.,[1]
Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24403-07, 24404-07,    Filed January 31, 2011.
            10818-08, 10819-08.


<u>James R. Monroe</u>, for petitioners.

<u>Catherine S. Tyson</u>, for respondent.

_____

    [1]Cases of the following petitioners are consolidated here-
with:  Debra K. Dursky, docket Nos. 24404-07 and 10819-08; and
DKD Enterprises a.k.a. DKD Enterprises, Inc., docket No. 10818-
08.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined the following defi-
ciencies in, additions under section 6651(a)(1)[2] to, and
accuracy-related penalties under section 6662(a) on each peti-
tioner's Federal income tax (tax):

| Petitioner | Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|---|
| DKD | 2003 | $23,458.61 | $2,345.86 | -- |
| | 2004 | 47,740.00 | 4,774.00 | $9,548.00 |
| | 2005 | 42,376.00 | -- | 8,475.00 |
| Ms. Dursky | 2003 | 17,476.00 | -- | -- |
| | 2004 | 16,403.00 | -- | 3,280.60 |
| | 2005 | 12,604.00 | -- | 2,520.80 |

The issues remaining for decision for the years at issue
are:[3]

(1)  Is DKD Enterprises, Inc. (DKD), entitled to deduct
under section 162(a) certain respective amounts relating to its
cattery activity that it (a) reimbursed to Debra K. Dursky (Ms.
Dursky) and her personal partner, Elizabeth Watkins (Ms.

---

[2]All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

[3]In addition to the issues remaining for decision that are
listed in the text, there are other questions relating to certain
determinations in the respective notices of deficiency with
respect to those years that respondent issued to Ms. Dursky and
DKD which are computational in that their resolution flows from
our resolution of certain of the issues that we address herein.

Watkins), (b) paid to Ms. Watkins, (c) paid for certain "taxes and licenses", and (d) paid to Ms. Dursky? We hold that it is not.

(2) Is Ms. Dursky required to include in gross income as constructive dividends the certain respective amounts that we have held with respect to issue (1) DKD is not entitled to deduct? We hold that she is.

(3) In the light of our holdings with respect to issues (1) and (2), is Ms. Dursky entitled to deduct under section 162(a) the certain respective amounts that we have held DKD is not entitled to deduct? We hold that she is not.

(4) In the light of our holding with respect to issue (1), is Ms. Dursky entitled to deduct in Schedule E, Supplemental Income and Loss (Schedule E), certain respective amounts of home mortgage interest and real estate taxes that she paid? We hold that she is not.

(5) Is DKD a qualified personal service corporation, as defined in section 448(d)(2), that is subject to the 35-percent tax rate prescribed in section 11(b)(2)? We hold that it is not.

(6) Is DKD entitled to deduct under section 162(a) certain amounts that it paid into a certain account that Fidelity Investments maintained for it? We hold that it is not.

(7) Is Ms. Dursky required to include in gross income as constructive dividends certain amounts that we have held with

respect to issue (6) DKD is not entitled to deduct?  We hold that she is.

(8)  Is DKD entitled to deduct under section 162(a) certain amounts of premiums that it paid with respect to a health insurance policy that Ms. Dursky purchased for herself?  We hold that it is not.

(9)  Is Ms. Dursky entitled to exclude from gross income the certain amounts of premiums that that we have held with respect to issue (8) DKD is not entitled to deduct?  We hold that she is not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At all relevant times, including throughout 2003 through 2005 (the years at issue) and at the times Ms. Dursky filed the respective petitions in the cases at docket Nos. 24404-07 and 10819-08, Ms. Dursky resided in a house that she owned (Ms. Dursky's residence) in West Des Moines, Iowa (West Des Moines). For an undisclosed period starting before the years at issue to at least the time of the trial in these cases, Ms. Dursky's personal partner, Ms. Watkins, resided with Ms. Dursky in Ms. Dursky's residence.

At all relevant times, including throughout the years at issue and at the times DKD filed the respective petitions in the

cases at docket Nos. 24403-07 and 10818-08, DKD maintained its place of operation at Ms. Dursky's residence.

At all relevant times, Ms. Dursky was the sole owner of Ms. Dursky's residence, which had approximately 2,100 square feet of space. During each of the years at issue, the monthly fair rental value of Ms. Dursky's residence was $1,600.

Dallas County, Iowa (Dallas County), the county in which Ms. Dursky's residence was located, assessed the following real property tax on that residence for the real property tax year indicated:

| Real Property Tax Assessed | Real Property Tax Year Ended March 31 |
| --- | --- |
| $3,976 | 2003 |
| 3,966 | 2004 |
| 3,708 | 2005 |
| 3,630 | 2006 |

At all relevant times, Ms. Dursky's residence was subject to a home mortgage loan on which Ms. Dursky paid an undisclosed amount of interest (home mortgage interest) during each of the years at issue.

For an undisclosed period starting before 1997 through at least the years at issue, Ms. Dursky was an information technology (IT) consultant. On May 28, 1997, Ms. Dursky incorporated DKD to provide IT consulting services.

At all relevant times, including throughout the years at issue, DKD employed Ms. Dursky, who was the sole stockholder and the sole officer of DKD, to perform IT consulting services for it.[4]

At all relevant times, including throughout the years at issue, DKD provided IT consulting services to a company known as Octagon. At those times, Octagon, in turn, provided IT consulting services to other companies such as Wells Fargo. Octagon paid DKD on an hourly basis for the IT consulting services that DKD performed for it. During the years at issue, Ms. Dursky was the only person whom DKD employed to work on matters relating to DKD's IT consulting business.

Ms. Dursky spent approximately 2,000 hours during 2003 and approximately 2,200 hours during each of the years 2004 and 2005 working for DKD in its IT consulting business. DKD paid Ms. Dursky $80,400 annually as compensation for the IT consulting work that she performed for DKD during each of the years 2003, 2004, and 2005.[5]

For each of the years 2003 through 2005, DKD issued to Ms. Dursky Form W-2, Wage and Tax Statement (Form W-2), in which it

---

[4]At least during the years at issue, Ms. Dursky did not have a written employment agreement with DKD.

[5]DKD also paid Ms. Dursky $80,400 annually as compensation for the IT consulting work that she performed for DKD during each of the years 2001 and 2002.

reported that it had paid her wages of $80,400. In each of those Forms W-2, DKD also reported certain respective amounts of "Federal income tax withheld", "Social security wages", "Social security tax withheld", "Medicare wages and tips", "Medicare tax withheld", "State wages, tips, etc.", and "State income tax". DKD did not report any other amounts in each of those forms.

Throughout the years at issue, Ms. Dursky's personal assets consisted primarily of Ms. Dursky's residence, certain retirement accounts, certain automobiles, certain stocks, including her 100-percent stock interest in DKD, a joint checking account that Ms. Dursky maintained with Ms. Watkins, and certain cats, kittens, and equipment (e.g., cat trees, feeding bowls, litter boxes) relating to a cattery.

Cattery Activity of Ms. Dursky and Ms. Watkins

Since at least 1989 Ms. Watkins, and since at least 1994 Ms. Dursky, each was engaged in the hobby of operating a cattery from which each derived significant personal pleasure. That cattery operation included breeding, raising, and offering for sale certain cats and certain kittens, attending certain cat shows, and entering in some of those shows some of those cats and kittens (cattery activity).

At a time not disclosed by the record before the years at issue, Ms. Dursky and Ms. Watkins became engaged in the hobby of jointly operating a cattery (cattery activity of Ms. Dursky and

Ms. Watkins) from which they continued to derive significant personal pleasure. Ms. Dursky and Ms. Watkins had at least the following two breeds of cats in the cattery activity of Ms. Dursky and Ms. Watkins: The Maine Coon breed (Maine Coons) and the Norwegian Forest breed (Norwegian Forest cats).[6]

The cattery activity of Ms. Dursky and Ms. Watkins took place in Ms. Dursky's residence, except for attending cat shows and visiting veterinarians. The cattery activity of Ms. Dursky and Ms. Watkins required them to spend substantial time and substantial money in operating that activity. As part of the cattery activity of Ms. Dursky and Ms. Watkins, they traveled extensively to certain cat shows in the United States. The money that Ms. Dursky and Ms. Watkins spent in operating that activity was for, inter alia, cat food, cat litter, veterinarians, cat show entrance fees, and transportation, meals, and lodging relating to the attendance by Ms. Dursky and/or Ms. Watkins at certain cat shows.

At a time not disclosed by the record before the years at issue, Ms. Dursky and Ms. Watkins created a Web site (cattery activity Web site) that they maintained for the cattery activity

---

[6]In 1989, a person or persons not identified by the record operated a cattery for Maine Coons. In 1994, Ms. Dursky was operating a cattery for Norwegian Forest cats. In 1997, Ms. Dursky and Ms. Watkins were jointly operating a cattery for Norwegian Forest cats. At a time not disclosed by the record, Ms. Dursky and Ms. Watkins were jointly operating a cattery for Maine Coons.

of Ms. Dursky and Ms. Watkins.  At the time of the trial in these cases, the general public was able to access that Web site, although it had not been updated since 2002.

The cattery activity Web site stated:  "We treat our cats as members of our family", and "we have invested too much love in our wonderful kittens to risk exposing them to an uncertain and risky environment."  The cattery activity Web site also indicated that kittens were born in one of the bedrooms in Ms. Dursky's residence, that the kittens stayed in the bedroom for five to eight weeks after birth, and that after the kittens were older and well socialized "they are then allowed to run the house with the other cats."  The cattery activity Web site stated that "Our goal * * * is to breed healthy, well-socialized Wegies [Norwegian Forest cats] who are at home--whether in the show ring or simply as a beloved member of the family."  That Web site further stated that "Our goal is to breed healthy, large, shaggy coated Maine Coons with a gentle, loving personality."

As part of the cattery activity of Ms. Dursky and Ms. Watkins, Ms. Dursky and Ms. Watkins participated in certain competitions, clubs, and associations and attended cat shows over much of the United States and developed relationships with cat breeders around the world.  In this regard, the cattery activity Web site stated:

We currently show exclusively in the Cat Fanciers Association (CFA).  We have shown five of our cats to Regional Wins and two of our female NFC's [Norwegian Forest cats] have produced such outstanding offspring that they achieved the coveted title of CFA Distinguished Merit.  Currently less than 10 Norwegian Forest Cats throughout the world have been awarded the title of Distinguished Merit--it is the highest award that CFA presents to a breeding pedigreed cat and we are very proud to [be] the owners of TWO NFC DM's [Distinguished Merits]!  We are currently members of two CFA clubs, the Hawkeye Cat Club and the Lucky Tomcat Club.  In addition, we are also members of the CFA Norwegian Forest Cat Breed Council and Deb [Ms. Dursky] is a Breeder Member of the Norwegian Forest Cat Fanciers Association.  By attending shows over much of the United States we have developed friendships with breeders and exhibitors from around the world.  Our success is built on the trust of those breeders who have sold us our cats, permitted us to use their studs, and to all those breeders who came before them. * * *

The cattery activity Web site also indicated that the Cat Fanciers' Association (CFA), the largest association for owners of cats in the United States,[7] had designated the cattery activity of Ms. Dursky and Ms. Watkins as a "CFA Approved Cattery of Excellence".  The cattery activity Web site advertised for sale a cat for $75, a cat for $150, a kitten for $200, and a kitten for $400.

Cattery Activity During the Years at Issue

During each of the years at issue, DKD had two activities: A consulting activity and a cattery activity (DKD's cattery

---

[7]CFA imposed ethical standards and practices for catteries.

activity).[8]  Ms. Dursky and Ms. Watkins operated DKD's cattery activity.  DKD's cattery activity was the cattery activity in which Ms. Dursky and Ms. Watkins had engaged before the years at issue.  While operating DKD's cattery activity during each of the years at issue, Ms. Dursky and Ms. Watkins continued to breed, raise, and offer for sale certain cats and certain kittens at Ms. Dursky's residence[9] and to attend certain cat shows in some of which they entered some of those cats and kittens.[10]  As was true while they were operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, Ms. Dursky and Ms. Watkins continued to derive significant personal pleasure while operating DKD's cattery activity during the years at issue.

During each of the years at issue, DKD used, without purchasing, in DKD's cattery activity the assets (e.g., cats, kittens, cat trees, feeding bowls, litter boxes) that Ms. Dursky

---

[8]By referring to the cattery activity of DKD as "DKD's cattery activity", we are in no way implying or suggesting that during any of the years at issue DKD's cattery activity constituted a trade or business of DKD within the meaning of sec. 162(a).

[9]Of the approximately 2,100 square feet of space at Ms. Dursky's residence, Ms. Dursky and Ms. Watkins used approximately 474 square feet in operating DKD's cattery activity during each of the years at issue.

[10]During each of the years at issue, Ms. Dursky and Ms. Watkins did not attend all of the cat shows in which they entered certain cats and/or kittens while operating DKD's cattery activity.

and Ms. Watkins had used before those years in the cattery activity of Ms. Dursky and Ms. Watkins.

During each of the years at issue, Ms. Dursky spent approximately 800 hours in operating DKD's cattery activity. As discussed above, during each of those years, DKD continued to pay to Ms. Dursky the same amount of wages (i.e., $80,400) that it had paid to her in 2001 and 2002. The wages that DKD paid to Ms. Dursky also remained unchanged in 2006, the year in which DKD discontinued DKD's cattery activity.

During each of the years at issue, Ms. Watkins spent more hours than Ms. Dursky in operating DKD's cattery activity. During each of those years, DKD made payments to Ms. Watkins totaling $7,700. (We shall refer to any, some, or all of those payments as DKD's payments to Ms. Watkins.) For each of the years at issue, DKD withheld Social Security tax and Medicare tax from DKD's payments to Ms. Watkins.

For each of the years at issue, DKD issued Form W-2 to Ms. Watkins in which it reported that it had paid her wages of $7,700. For each of those years, Ms. Watkins filed a tax return in which she included in gross income the $7,700 that she had received from DKD during each such year.

For each of the taxable years at issue, DKD filed Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and for each quarter during each of those years, DKD filed Form 941,

Employer's Quarterly Federal Tax Return.  In each of those forms, DKD reported DKD's payments to Ms. Watkins and paid any Federal tax shown due in each such form.

During the years at issue, while operating DKD's cattery activity Ms. Dursky and Ms. Watkins desired to expand on the national reputation of the cattery activity of Ms. Dursky and Ms. Watkins that they had developed before those years.  In order to do so, Ms. Dursky and Ms. Watkins relied on their respective years of cattery activity experience and their respective reputations in the so-called cattery world.

While operating DKD's cattery activity during the years at issue, Ms. Dursky and Ms. Watkins bred, raised, and offered for sale Norwegian Forest cats and entered certain of those cats in certain cat shows.[11]  Starting at an undisclosed time in 2004, they bred, raised, and offered for sale Abyssinian cats and entered certain of those cats in certain cat shows.

While operating DKD's cattery activity during 2003, Ms. Dursky and Ms. Watkins produced approximately seven to nine kittens from approximately five to seven litters.  While operating DKD's cattery activity during each of the years 2004

---

[11]The number of breeders that bred Norwegian Forest cats in the Midwest region of the United States increased from approximately three at the beginning of 2003 to approximately 10 to 15 by 2005.

and 2005, Ms. Dursky and Ms. Watkins produced approximately nine kittens from approximately three litters.

While operating DKD's cattery activity during the years at issue, Ms. Dursky and Ms. Watkins entered at least 62 cats, 49 cats, and 45 cats, respectively, in various cat shows that were typically held on the east coast or the west coast of the United States. In order to enter a cat in any such show, the owner of the cat was required to prepay a nonrefundable entrance fee. Ms. Dursky and Ms. Watkins did not attend all the cat shows in which they entered cats. During the years at issue, Ms. Watkins typically attended cat shows without Ms. Dursky, although Ms. Dursky attended some cat shows with Ms. Watkins.[12]

While operating DKD's cattery activity during 2003, 2004, and 2005 Ms. Watkins attended 30 cat shows, 31 cat shows, and 28 cat shows, respectively, and Ms. Dursky attended a relatively small number of those shows with Ms. Watkins. When one or both of them attended a cat show, one or both made arrangements for travel and lodging. If Ms. Dursky and/or Ms. Watkins attended a cat show that was not within driving distance of West Des Moines, it took approximately 40 hours in order to travel to and from, and participate in, the show. If Ms. Dursky and/or Ms. Watkins attended a cat show that was within driving distance of West Des

_____

[12]The record does not establish how many cat shows during each of the years at issue Ms. Watkins attended with Ms. Dursky and without Ms. Dursky.

Moines, it took approximately 32 hours in order to travel to and from, and participate in, the show.

As was true of the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, DKD's cattery activity was designated by the CFA during the years at issue as a "Cattery of Excellence".

As was true of their beliefs while operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity during the years at issue they believed that the price of any cat or kitten offered for sale would increase if the cats and kittens that they bred won national cat shows. While operating DKD's cattery activity during the years at issue, Ms. Dursky and Ms. Watkins produced a total of four cats that won national championships.[13]

During each of the years at issue, the monthly fair rental value of Ms. Dursky's residence was $1,600. During none of those

---

[13]National championship winners were determined on the basis of the total number of points earned by a cat during cat show season. Cats earned points by winning cat shows; the number of points earned depended on the number of cats competing in a show. The number of cats competing in a cat show typically was not determined until shortly before the show. Ms. Dursky and Ms. Watkins often waited until the number of cats competing in a cat show was determined before deciding whether to attend the show. Because they waited until shortly before a cat show was scheduled to take place to decide whether to attend it, Ms. Dursky and Ms. Watkins paid a premium for any air transportation costs incurred to attend the show.

years was there a written rental agreement between Ms. Dursky and DKD with respect to Ms. Dursky's residence. Nonetheless, during each of the years at issue, DKD paid Ms. Dursky $1,000 monthly, or $12,000 annually (DKD's purported rent), for its claimed partial use of Ms. Dursky's residence for DKD's cattery activity. In arriving at that amount, neither Ms. Dursky nor DKD obtained an appraisal to determine the fair rental value of (1) Ms. Dursky's residence or (2) the portion of that residence used in a cattery activity during each of the years at issue. Instead, Ms. Dursky, DKD, and Howard Musin (Mr. Musin), the tax return preparer of Ms. Dursky and DKD for at least each of the years 2003 and 2004,[14] agreed that DKD should pay each month to Ms. Dursky $1,000 for the use of Ms. Dursky's residence for a cattery activity. Ms. Dursky, DKD, and Mr. Musin also agreed that DKD should pay to Ms. Dursky 10 percent of certain expenses (e.g., utilities, repairs) relating to Ms. Dursky's residence as allocable to a cattery activity.[15]

---

[14]Mr. Musin's colleague, Jill Schwartz (Ms. Schwartz), the tax return preparer of DKD for the year 2001, also advised Ms. Dursky and DKD regarding the amount that DKD should pay Ms. Dursky for the use of Ms. Dursky's residence for a cattery activity.

[15]Ms. Schwartz also advised Ms. Dursky and DKD regarding DKD's paying Ms. Dursky 10 percent of certain expenses (e.g., utilities, repairs) relating to Ms. Dursky's residence as allocable to a cattery activity.

The record does not establish whether DKD paid to Ms. Dursky
(continued...)

As was true while they were operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity during the years at issue they continued to incur and pay substantial expenses. As discussed below, at least during each of the years at issue, DKD reimbursed Ms. Dursky and Ms. Watkins for those expenses[16] and also paid directly a very small amount of expenses relating to the operation of DKD's cattery activity.

During each of the years at issue, Ms. Watkins used certain computer software in order to record for each of those years the substantial amounts expended and the insubstantial amounts received while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity during each of those years.

During 2003, DKD reimbursed Ms. Dursky and Ms. Watkins $60,968 for the following amounts (2003 reimbursed cattery expenses) that they had paid:

---

[15](...continued)
10 percent of any such expenses.

[16]During each of the years at issue, DKD reimbursed Ms. Dursky and Ms. Watkins for certain amounts that they had expended as shown on certain receipts by issuing checks drawn on DKD's bank account over which only Ms. Dursky had signature authority.

| Type of Expense | Amount |
| --- | --- |
| Mileage to cat shows | $4,277 |
| Motels | 5,669 |
| Meals (50 percent) | 1,151 |
| Entry fees | 6,786 |
| Airfares | 13,953 |
| Pet sitters | 2,566 |
| Rental cars | 2,107 |
| Cattery cleaning | 1,761 |
| Veterinarian bills | 13,576 |
| Postage | 150 |
| Litter and food | 5,993 |
| Grooming products | 1,212 |
| Advertising | 1,767 |
| Total | 60,968 |

During 2003, in addition to DKD's payments to Ms. Watkins of $7,700 and DKD's purported rent of $12,000 that DKD paid to Ms. Dursky, DKD paid directly $588 of unidentified "taxes and licenses".

During 2004, DKD reimbursed Ms. Dursky and Ms. Watkins $66,734 for the following amounts (2004 reimbursed cattery expenses) that they had paid:

| Type of Expense | Amount |
|---|---|
| Mileage to cat shows | $4,643 |
| Motels | 8,385 |
| Meals (50 percent) | 1,814 |
| Entry fees | 6,338 |
| Airfares | 7,652 |
| Pet sitters | 2,095 |
| Rental cars | 1,994 |
| Cattery cleaning | 5,080 |
| Veterinarian bills | 14,759 |
| Postage | 167 |
| Litter and food | 7,029 |
| Photos | 817 |
| Grooming and misc. supplies | 3,004 |
| Advertising | 1,580 |
| Long-distance telephone | 1,327 |
| Misc. travel | 50 |
| Total | 66,734 |

During 2004, in addition to DKD's payments to Ms. Watkins of $7,700 and DKD's purported rent of $12,000 that DKD paid to Ms. Dursky, DKD paid directly $588 of unidentified "taxes and licenses".

During 2005, DKD reimbursed Ms. Dursky and Ms. Watkins $68,329 for the following amounts (2005 reimbursed cattery expenses) that they had paid:

| Type of Expense | Amount |
|---|---|
| Mileage to cat shows | $6,350 |
| Motels | 8,121 |
| Meals (50 percent) | 1,659 |
| Entry fees | 2,848 |
| Airfares | 16,885 |
| Rental cars | 2,618 |
| Veterinarian bills | 13,860 |
| Postage | 42 |
| Litter | 1,664 |
| Cat food | 8,613 |
| Photos | 78 |
| Grooming and misc. supplies | 4,190 |
| Advertising | 1,401 |
| Total | 68,329 |

During 2005, in addition to DKD's payments to Ms. Watkins of $7,700 and DKD's purported rent of $12,000 that DKD paid to Ms. Dursky, DKD paid directly $588 of unidentified "taxes and licenses".

In addition to reimbursing Ms. Dursky and Ms. Watkins for the amounts described above that they paid during each of the years at issue, DKD reimbursed them (1) $297.84 in 2003 for lodging and food that they had paid in that year for the mother of Ms. Watkins who had attended a banquet honoring them for winning a national cat show, (2) $88.97 in 2003 for restaurant food that Ms. Watkins' mother had paid in that year, and (3) $412 in 2004 for entry tickets to Walt Disney World that Ms. Dursky and Ms. Watkins had paid in that year.  (We shall refer to the reimbursements described in (1) and (2) as DKD's 2003 reimburse-

ments for lodging and food relating to Ms. Watkins' mother.  We shall refer to the reimbursements described in (3) as DKD's 2004 reimbursements for entry tickets for Ms. Dursky and Ms. Watkins to Walt Disney World.)

During 2003, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity.  During 2004, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity except for three cats and/or kittens that they sold in December of that year for a total of $250.  During 2005, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity except for a total of eight cats and/or kittens that they sold in June, July, August, October, and November of that year for a total of $1,525.[17]

In 2006, at an undisclosed time in or before August, Mr. Musin and Ms. Schwartz informed petitioners that the Internal Revenue Service (IRS) was investigating Mr. Musin and Ms. Schwartz and intended to commence an examination of petitioners' respective tax returns for 2003 and 2004.  As a result, around August 2006, (1) Ms. Dursky and Ms. Watkins discontinued

_____

[17]During 2005, while operating DKD's cattery activity Ms. Dursky and Ms. Watkins sold (1) a total of three cats and/or kittens in June for a total of $200, (2) a total of two cats and/or kittens in July for a total of $200, (3) one cat or kitten in August for $100, (4) one kitten in October for $575, and (5) one kitten in November for $450.

operating DKD's cattery activity,[18] (2) Ms. Dursky and Ms.
Watkins continued operating that cattery activity as the cattery
activity of Ms. Dursky and Ms. Watkins, and (3) Ms. Dursky and
DKD retained James R. Monroe (Mr. Monroe).[19]

Certain Retirement Accounts

Vanguard

In December 1995, Ms. Dursky executed a document entitled
"VANGUARD PROFIT-SHARING PLAN SIMPLIFIED ADOPTION AGREEMENT
(006)" (Vanguard plan document) that by its terms was effective
on January 1, 1995.  The Vanguard plan document stated that Debra
K. Dursky was the employer and that the employer was a "Sole
Proprietor/Self-Employed Individual".  That document also stated
that Debra K. Dursky was the plan administrator and that Vanguard
Fiduciary Trust Company (Vanguard) was the plan trustee.  The
Vanguard plan document did not identify a beneficiary.  The
Vanguard plan document also stated:

> the Employer [Debra K. Dursky] shall make contributions
> to the Trust for each Plan Year in an amount determined
> by the Employer in its sole discretion by resolution
> duly adopted on or before the last day for filing its
> federal income tax return, including extensions, for

---

[18]Although Ms. Dursky and Ms. Watkins did not discontinue
operating DKD's cattery activity until around August 2006, as
discussed below, DKD did not claim any deductions relating to
DKD's cattery activity in the tax return that it filed for its
taxable year 2006.

[19]Mr. Monroe prepared petitioners' respective tax returns
for 2005 and is the lead attorney representing petitioners in
these cases.

the taxable year with or within which such Plan Year ends.

Pursuant to the Vanguard plan document, on certain dates in 2003 and 2006 Ms. Dursky sent the following checks to Vanguard that she intended to be contributions under that plan document. On December 30, 2003, Ms. Dursky sent a $10,000 check to Vanguard for her benefit that was drawn on DKD's bank account maintained at Bankers Trust (DKD's bank account). In the so-called memo portion of that check, Ms. Dursky wrote, inter alia, "2003 Keogh". On April 10, 2006, Ms. Dursky sent a $10,000 check to Vanguard for her benefit that was drawn on DKD's bank account.

During none of the years 2003 through 2005 did Ms. Dursky make any contributions under the Vanguard plan document for the benefit of Ms. Watkins.

Fidelity

On December 28, 2001, Ms. Dursky executed on behalf of DKD a document that was entitled "Profit Sharing Plan Application" (Fidelity application document) in order to open an account for a profit-sharing plan at Fidelity (DKD Fidelity profit-sharing plan). Ms. Dursky completed and signed that document on behalf of DKD. The Fidelity application document indicated that the employer was DKD Enterprises, Inc. Nonetheless, Ms. Dursky checked the box in that document marked "Self-Employed" and did not check the box marked "Incorporated". In response to the question in the Fidelity application document "**Do you currently**

**have or have you ever maintained another qualified plan?**", Ms. Dursky stated: "Vanguard - 15% Fidelity - 85%".

On December 28, 2001, Ms. Dursky also executed on behalf of DKD a document that was entitled "Profit Sharing Plan Contribution Form" (Fidelity contribution document). The Fidelity contribution document indicated that the only participant under the DKD Fidelity profit-sharing plan was Ms. Dursky.

On certain dates in 2004, 2005, and 2006 DKD sent the following checks to Fidelity that were intended to be contributions under the DKD Fidelity profit-sharing plan. On April 14, 2004, DKD sent a $10,000 check to Fidelity for the benefit of Ms. Dursky that was drawn on DKD's bank account. In the so-called memo portion of that check, Ms. Dursky wrote, inter alia, "Fidelity Profit Sharing Keogh * * * for 2003". On December 27, 2004, DKD sent a $10,000 check to Fidelity for the benefit of Ms. Dursky that was drawn on DKD's bank account. In the so-called memo portion of that check, Ms. Dursky wrote, inter alia, "Keogh * * * for 2004". On April 11, 2005, DKD sent a $10,000 check to Fidelity for the benefit of Ms. Dursky that was drawn on DKD's bank account. In the so-called memo portion of that check, Ms. Dursky wrote, inter alia, "2004 Keogh". On April 10, 2006, DKD sent a $5,000 check to Fidelity for the benefit of Ms. Dursky that was drawn on DKD's bank account. In the so-

called memo portion of that check, Ms. Dursky wrote, inter alia, "2005".

During none of the years 2003 through 2005 did DKD send any checks to Fidelity that were intended to be contributions under the DKD Fidelity profit-sharing plan for the benefit of Ms. Watkins.

Ms. Dursky's Health Insurance Policy

At a time not disclosed by the record, Ms. Dursky purchased a health insurance policy in her name (Ms. Dursky's health insurance policy) that was in effect at least during each of the years 2003 and 2004 and that required her to pay certain quarterly premiums to the company (health insurance provider) that issued that policy to her. During 2003 and 2004, DKD paid to Ms. Dursky's health insurance provider the following premiums on the dates indicated for Ms. Dursky's health insurance policy:

2003

| Date | Amount |
|------|--------|
| Mar. 30 | $1,687.50 |
| July 14 | 1,687.50 |
| Sept. 14 | 1,687.50 |
| Dec. 30 | 1,887.60 |
| Total | 6,950.10 |

2004

| Date | Amount |
|------|--------|
| Apr. 5 | $1,887.60 |
| June 16 | 1,887.60 |
| Oct. 4 | 1,887.60 |
| Dec. 27 | 1,988.70 |
| Total | 7,651.50 |

DKD's Tax Returns

2001

DKD filed Form 1120, U.S. Corporation Income Tax Return (Form 1120), for 2001 (DKD's 2001 return) that Ms. Schwartz signed as return preparer and that Ms. Dursky signed as the sole officer of DKD. In Schedule K, Other Information (Schedule K), of DKD's 2001 return, DKD indicated that it was on the cash method of accounting.

In DKD's 2001 return, DKD reported (1) "Gross receipts or sales" of $2,770,[20] (2) "returns and allowances" of zero, (3) "Cost of goods sold" of zero, (4) "Other income" of $226,923,[21] and (5) "**Total income**" of $229,693.

In DKD's 2001 return, DKD claimed, inter alia, the following deductions: (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of zero, (3) "Rents" of $19,150, (4) "Taxes and licenses" of $6,307,[22] (5) "Pension, profit-sharing, etc., plans" of $30,000, and (6) "Employee benefit programs" of $8,852. In that return, DKD also claimed "Other

---

[20]The record does not establish the nature of the "Gross receipts or sales" that DKD reported in DKD's 2001 return.

[21]DKD included a schedule with DKD's 2001 return in which DKD indicated that the "Other income" of $226,923 reported consisted of (1) consulting revenue of $223,796 and (2) an Iowa State tax refund of $3,127.

[22]DKD included a statement with DKD's 2001 return in which it described the "Taxes and licenses" claimed as "payroll taxes".

deductions" of $55,210.  DKD included a schedule with DKD's 2001

return in which it indicated that the "Other deductions" claimed

consisted of the following types and amounts of deductions:

| Claimed Deduction | Amount |
|---|---|
| Cattery expenses[1] | $19,391 |
| Show fees[1] | 4,076 |
| Promotional labor | 1,850 |
| Accounting | 1,100 |
| Postage | 541 |
| Insurance | 1,966 |
| Insurance - workman's compensation | 213 |
| Licenses and permits | 50 |
| Meals | 1,772 |
| Supplies | 9,034 |
| Telephone | 2,183 |
| Travel[1] | 12,680 |
| Utilities | 354 |
| Total | 55,210 |

[1]DKD's claimed deductions for "Cattery expenses", "Show
fees", and "Travel" were for amounts that Ms. Dursky and Ms.
Watkins paid during 2001 in operating the cattery activity of Ms.
Dursky and Ms. Watkins.

DKD attached to DKD's 2001 return Schedule L, Balance Sheets

per Books (Schedule L), for 2001 (2001 Schedule L).  In that

schedule, DKD showed the following assets:  "Cash", "Trade notes

and accounts receivable", and "Buildings and other depreciable

assets".  DKD did not show any other assets in the 2001 Schedule

L, such as cats, kittens, cat trees, feeding bowls, litter boxes,

or other assets relating to a cattery activity.

2002

DKD filed Form 1120 for 2002 (DKD's 2002 return) that Mr. Musin signed as return preparer and that Ms. Dursky signed as the sole officer of DKD. In Schedule K of DKD's 2002 return, DKD indicated that it was on the cash method of accounting.

In DKD's 2002 return, DKD reported (1) "Gross receipts or sales" of $800,[23] (2) "returns and allowances" of zero, (3) "Cost of goods sold" of zero, (4) "Other income" of $198,608,[24] and (5) "**Total income**" of $199,408.

In DKD's 2002 return, DKD claimed, inter alia, the following deductions: (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of $7,350, (3) "Rents" of $19,800, (4) "Taxes and licenses" of $7,354,[25] (5) "Pension, profit-sharing, etc., plans" of $10,000, and (6) "Employee benefit programs" of $6,931. In that return, DKD also claimed "Other deductions" of $58,424. DKD included a schedule with DKD's 2002 return in which it indicated that the "Other deductions" claimed consisted of the following types and amounts of deductions:

---

[23]The record does not establish the nature of the "Gross receipts or sales" that DKD reported in DKD's 2002 return.

[24]DKD included a schedule with DKD's 2002 return in which DKD indicated that the "Other income" of $198,608 reported consisted of (1) consulting revenue of $197,466 and (2) an Iowa State tax refund of $1,142.

[25]DKD included a statement with DKD's 2002 return in which it described the "Taxes and licenses" claimed as "payroll taxes".

| Claimed Deduction | Amount |
|---|---|
| Cattery expenses[1] | $26,784 |
| Show fees[1] | 4,485 |
| Labor | 1,245 |
| Accounting | 550 |
| Automobile | 5,170 |
| Postage | 261 |
| Licenses and permits | 45 |
| Office | 557 |
| Supplies | 1,550 |
| Telephone | 2,805 |
| Travel and entertainment[1] | 14,571 |
| Utilities | 401 |
| Total | 58,424 |

[1]DKD's claimed deductions for "Cattery expenses", "Show fees", and "Travel and entertainment" were for amounts that Ms. Dursky and Ms. Watkins paid during 2002 in operating the cattery activity of Ms. Dursky and Ms. Watkins.

DKD attached to DKD's 2002 return Schedule L for 2002. In that schedule, DKD did not show any assets.

2003

DKD filed late Form 1120 for 2003 (DKD's 2003 return), the first year at issue in these cases, that Mr. Musin signed as return preparer and that Ms. Dursky signed as the sole officer of DKD. In Schedule K of DKD's 2003 return, DKD indicated that it was on a "MODIFIED ACCRUAL" method of accounting but did not indicate what that meant.

In DKD's 2003 return, DKD reported (1) "Gross receipts or sales" of $197,582. None of that amount was from DKD's cattery activity. In DKD's 2003 return, DKD also reported (1) "returns and allowances" of zero, (2) "Cost of goods sold" of zero,

(3) "Other income" consisting of an "IOWA TAX REFUND" of $675, and (4) "**Total income**" of $198,257.

In DKD's 2003 return, DKD claimed, inter alia, the following deductions: (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of $7,700, (3) "Rents" of $19,400, (4) "Taxes and licenses" of $6,861,[26] (5) "Pension, profit-sharing, etc., plans" of $20,000, and (6) "Employee benefit programs" of $10,274. In that return, DKD also claimed "Other deductions" of $75,000. DKD included a schedule with DKD's 2003 return in which it indicated that the "Other deductions" claimed consisted of the following types and amounts of deductions:

| Claimed Deduction | Amount |
|---|---|
| Cattery expenses[1] | $69,515 |
| Accounting | 2,025 |
| Dues and subscriptions | 286 |
| Insurance | 1,687 |
| Insurance – workman's compensation | 363 |
| Office | 26 |
| Travel and entertainment | 1,098 |
| Total | 75,000 |

[1]DKD's claimed deduction for "Cattery expenses" of $69,515 included the 2003 reimbursed cattery expenses of $60,968. A portion of the claimed deduction for "Cattery expenses" (i.e., $386.81) was for DKD's 2003 reimbursements for lodging and food relating to Ms. Watkins' mother.

DKD attached to DKD's 2003 return Schedule L for 2003 (2003 Schedule L). In that schedule, DKD showed the following assets:

---

[26]DKD included a statement with DKD's 2003 return in which it described the "Taxes and licenses" claimed as "payroll taxes".

"Cash", "Trade notes and accounts receivable", and "Buildings and other depreciable assets".  DKD did not show any other assets in the 2003 Schedule L, such as cats, kittens, cat trees, feeding bowls, litter boxes, or other assets relating to a cattery activity.

2004

DKD filed late Form 1120 for 2004 (DKD's 2004 return).[27]  In Schedule K of DKD's 2004 return, DKD indicated that it was on a "MODIFIED ACCRUAL" method of accounting but did not indicate what that meant.

In DKD's 2004 return, DKD reported (1) "Gross receipts or sales" of $233,556,[28] (2) "returns and allowances" of zero, (3) "Cost of goods sold" of zero, (4) "Other income" consisting of an "IOWA TAX REFUND" of $1,000, and (5) **Total income** of $234,556.

In DKD's 2004 return, DKD claimed, inter alia, the following deductions:  (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of $7,700, (3) "Rents" of $24,700,

---

[27]The copy of DKD's 2004 return that is in the record is not signed by a return preparer or by an officer of DKD.

[28]The record does not establish whether the $250 that we have found DKD received in 2004 for the sale of certain cats and/or kittens in December of that year was included in the "Gross receipts or sales" of $233,556 that DKD reported in DKD's 2004 return.

(4) "Taxes and licenses" of $6,861,[29] (5) "Pension, profit-sharing, etc., plans" of zero, and (6) "Employee benefit programs" of $5,763.  In that return, DKD also claimed "Other deductions" of $105,414.  DKD included a schedule with DKD's 2004 return in which it indicated that the "Other deductions" claimed consisted of the following types and amounts of deductions:

| Claimed Deduction | Amount |
|---|---|
| Cattery expenses[1] | $75,091 |
| Accounting | 1,750 |
| Bank charges | 143 |
| Conventions and meetings | 1,500 |
| Disability insurance | 1,145 |
| Dues and subscriptions | 20,000 |
| Insurance | 3,373 |
| Office | 189 |
| Meals | 1,367 |
| Telephone | 697 |
| Travel | 159 |
| Total | 105,414 |

[1]DKD's claimed deduction for "Cattery expenses" of $75,091 included the 2004 reimbursed cattery expenses of $66,734.  A portion of the claimed deduction for "Cattery expenses" (i.e., $412) was for DKD's 2004 reimbursements for entry tickets for Ms. Dursky and Ms. Watkins to Walt Disney World.

DKD attached to DKD's 2004 return Schedule L for 2004 (2004 Schedule L).  In that schedule, DKD showed the following assets: "Cash", "Trade notes and accounts receivable", and "Buildings and other depreciable assets".  DKD did not show any other assets in the 2004 Schedule L, such as cats, kittens, cat trees, feeding

---

[29]DKD included a statement with DKD's 2004 return in which it described the "Taxes and licenses" claimed as "payroll taxes".

bowls, litter boxes, or other assets relating to a cattery activity.

2005

DKD filed Form 1120 for 2005 (DKD's 2005 return) that Mr. Monroe,[30] whom, as discussed above, DKD retained around August 2006, signed as return preparer and that Ms. Dursky signed as the sole officer of DKD. In Schedule K of DKD's 2005 return, DKD indicated that it was on a "MOD ACC" method of accounting but did not indicate what that meant.

In DKD's return, DKD reported (1) "Gross receipts or sales" of $212,970,[31] (2) "returns & allowances" of zero, (3) "Cost of goods sold" of zero, (4) "Other income" consisting of "State tax refunds" of $1,000, and (5) "**Total income**" of $213,970.

In DKD's 2005 return, DKD claimed, inter alia, the following deductions: (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of $7,700, (3) "Rents" of $22,800, (4) "Taxes and licenses" of $6,740,[32] (5) "Pension, profit-sharing, etc., plans" of zero, (6) "Employee benefit programs" of

---

[30]See supra note 19.

[31]The record does not establish whether the $1,525 that we have found DKD received in 2005 for the sale of certain cats and/or kittens, see supra note 17, was included in the "Gross receipts or sales" of $212,970 reported in DKD's 2005 return.

[32]Unlike DKD's 2001 return, 2002 return, 2003 return, and 2004 return, DKD did not include a statement with DKD's 2005 return or otherwise provide a description of the nature of the "Taxes and licenses" of $6,740 claimed in DKD's 2005 return.

zero, and (7) "Advertising" of $1,240.[33]  In that return, DKD also claimed "Other deductions" of $62,942.  DKD included a schedule with DKD's 2005 return, in which it indicated that the "Other deductions" claimed consisted of the following types and amounts of deductions:[34]

[33]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $1,401 for advertising.

[34]Most of the "Other deductions" were for the 2005 reimbursed cattery expenses of $68,329.  However, DKD did not claim a deduction for the $8,121 for which we have found DKD reimbursed Ms. Dursky and Ms. Watkins in 2005 for motels.

| Claimed Deduction[1] | Amount |
|---|---|
| Automobiles | $6,350 |
| Bank charges | 38 |
| Legal and professional | 1,175 |
| Meals and entertainment | [2]1,878 |
| Miscellaneous | [3]5,188 |
| Office | 52 |
| Postage | [4]41 |
| Telephone | 710 |
| Travel | [5]15,730 |
| Utilities | 377 |
| Annual report | 50 |
| Entry fees | [6]5,363 |
| Rental car | [7]1,214 |
| Veterinarian | [8]13,986 |
| Litter | [9]1,923 |
| Cat food | [10]8,014 |
| Photos | [11]53 |
| Stud service | 800 |
| Total | 62,942 |

[1]The deductions for automobiles, meals, miscellaneous, postage, travel, entry fees, rental cars, veterinarian, litter, cat food, photos, and stud service related to DKD's cattery activity. We shall refer to those deductions as "cattery expenses".

[2]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $1,659 for meals.

[3]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $4,190 for grooming and miscellaneous supplies.

[4]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $42 for postage.

[5]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $16,885 for airfares.

[6]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $2,848 for entry fees.

[7]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $2,618 for rental cars.

[8]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $13,860 for veterinarian bills.

[9]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $1,664 for litter.

[10]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $8,613 for cat food.

[11]We have found that during 2005 DKD reimbursed Ms. Dursky and Ms. Watkins $78 for photos.

DKD attached to DKD's 2005 return Schedule L for 2005. In that schedule, DKD did not show any assets.

2006

DKD filed Form 1120 for 2006, the year during which DKD discontinued DKD's cattery activity, that Mr. Monroe signed as return preparer and that Ms. Dursky signed as the sole officer of DKD. In Schedule K of DKD's Form 1120 for 2006 (DKD's 2006 return), DKD indicated that it was on a "MOD ACC" method of accounting but did not indicate what that meant.

In DKD's 2006 return, DKD reported (1) "Gross receipts or sales" of $177,519,[35] (2) "returns & allowances" of zero, (3) "Cost of goods sold" of zero, and (4) **Total income** of $177,519.

In DKD's 2006 return, DKD claimed, inter alia, the following deductions: (1) "Compensation of officers" of $80,400, (2) "Salaries and wages" of zero, (3) "Rents" of zero, (4) "Taxes and licenses" of $6,740,[36] (5) "Pension, profit-sharing, etc., plans" of $15,000, and (6) "Employee benefit programs" of $13,458. In that return, DKD also claimed "Other deductions" of $1,759. DKD included a schedule with DKD's 2006 return in which

---

[35]The record does not establish the nature of the "Gross receipts or sales" reported in DKD's 2006 return.

[36]Unlike DKD's 2001 return, 2002 return, 2003 return, and 2004 return, DKD did not include a statement with DKD's 2006 return or otherwise provide a description of the nature of the "Taxes and licenses" of $6,740 claimed in DKD's 2006 return.

it indicated that the "Other deductions" claimed consisted of the following types and amounts of deductions:

| Claimed Deduction | Amount |
|---|---|
| Dues and subscriptions | $35 |
| Legal and professional | 1,550 |
| Miscellaneous | 124 |
| Annual report | 50 |
| Total | 1,759 |

DKD did not claim any deductions in DKD's 2006 return with respect to DKD's cattery activity.[37]

DKD attached to DKD's 2006 return Schedule L for 2006. In that schedule, DKD did not show any assets.

Summary of DKD's Returns for 2001 Through 2006

The following chart summarizes DKD's tax return treatment of all income and certain deductions claimed for each of the years 2001 through 2006:

---

[37]We have found that Ms. Dursky and Ms. Watkins operated DKD's cattery activity until around August 2006.

| Income | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| "Gross receipts or sales" | $2,770 | $800 | $197,582 | $233,556 | $212,970 | $177,519 |
| "Other income" | 226,923 | 198,608 | 675 | 1,000 | 1,000 | -- |
| Deductions Claimed | | | | | | |
| Deductions claimed relating to DKD's cattery activity | | | | | | |
| "Cattery expenses" | 55,210 | 58,424 | 69,515 | 75,091 | 60,540 | -- |
| "Salaries and wages" | -- | 7,350 | 7,700 | 7,700 | 7,700 | -- |
| "Taxes and licenses" | 588 | 588 | 588 | 588 | 588 | -- |
| "Rent" | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | -- |
| "Compensation of officers" | 80,400 | 80,400 | 80,400 | 80,400 | 80,400 | 80,400 |
| "Pension, profit-sharing, etc., plans" | 30,000 | 10,000 | 20,000 | -- | -- | 15,000 |
| "Employee benefit programs" | 8,852 | 6,931 | 10,274 | 5,763 | -- | 13,458 |
| Income (loss) | 42,643 | 23,715 | (2,220) | 53,014 | 52,742 | 68,661 |

<u>Ms. Dursky's Returns</u>

    <u>2003</u>

    Ms. Dursky filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for 2003 (Ms. Dursky's 2003 return) that Mr. Musin signed as return preparer and that she signed. In that return, Ms. Dursky reported "Wages, salaries, tips, etc." of $80,400 that she received during 2003 from DKD as compensation for the IT consulting work that she performed for DKD during that year.

    In Schedule A--Itemized Deductions (Schedule A) attached to Ms. Dursky's 2003 return, Ms. Dursky deducted "Real estate taxes" of $3,458 and "Home mortgage interest and points" of $5,204.

    Ms. Dursky included with Ms. Dursky's 2003 return Schedule E for 2003 (2003 Schedule E). In the 2003 Schedule E, Ms. Dursky described the "**rental real estate property**" to which that schedule pertained as "**OFFICE SPACE WEST DES MOINE** [sic] **IA**". In that schedule, Ms. Dursky responded in the negative to the following question:

> For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of:
>
> • 14 days **or**
>
> • 10% of the total days rented at fair rental value?

In the 2003 Schedule E, Ms. Dursky reported "Rents received" of $19,400[38] and claimed deductions for "Mortgage interest paid to banks, etc." of $1,555 and for "Taxes" of $610.

2004

Ms. Dursky filed Form 1040 for 2004 (Ms. Dursky's 2004 return) that Mr. Musin signed as return preparer and that she signed. In that return, Ms. Dursky reported "Wages, salaries, tips, etc." of $80,400 that she received during 2004 from DKD as compensation for the IT consulting work that she performed for DKD during that year.

In Schedule A attached to Ms. Dursky's 2004 return, Ms. Dursky deducted "Real estate taxes" of $3,098 and "Home mortgage interest and points" of $4,302.

Ms. Dursky included with Ms. Dursky's 2004 return Schedule E for 2004 (2004 Schedule E). In the 2004 Schedule E, Ms. Dursky described the "**rental real estate property**" to which that schedule pertained as "**OFFICE SPACE WEST DES MOINE** [sic] **IA**". In that schedule, Ms. Dursky responded in the negative to the following question:

> For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of:

---

[38]As discussed above, in DKD's 2003 return, DKD claimed a deduction for "Rents" of $19,400.

- 14 days **or**

- 10% of the total days rented at fair rental value?

In the 2004 Schedule E, Ms. Dursky reported "Rents received" of $24,700[39] and claimed deductions for "Mortgage interest paid to banks, etc." of $1,555 and for "Taxes" of $610.

2005

Ms. Dursky filed Form 1040 for 2005 (Ms. Dursky's 2005 return) that Mr. Monroe, whom, as discussed above, DKD retained around August 2006, signed as return preparer and that she signed.  In that return, Ms. Dursky reported "Wages, salaries, tips, etc." of $80,400 that she received during 2005 from DKD as compensation for the IT consulting work that she performed for DKD during that year.

In Schedule A attached to Ms. Dursky's 2005 return, Ms. Dursky deducted "Real estate taxes" of $2,287 and "Home mtg interest and points" of $4,084.

Ms. Dursky included with Ms. Dursky's 2005 return Schedule E for 2005 (2005 Schedule E).  In the 2005 Schedule E, Ms. Dursky described the "**rental real estate property**" to which that schedule pertained as "**OFFICE SPACE WEST DES MOINES, IA**".  In that schedule, Ms. Dursky responded in the negative to the following question:

---

[39]As discussed above, DKD claimed a deduction in DKD's 2004 return for "Rents" of $24,700.

For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of:

- 14 days, **or**

- 10% of the total days rented at fair rental value?

In the 2005 Schedule E, Ms. Dursky reported "Rents received" of $12,000[40] and claimed deductions for "Mortgage interest paid to banks, etc." of $2,398 and for "Taxes" of $1,343.

Notices of Deficiency

DKD

On September 26, 2007, respondent issued to DKD a notice of deficiency (notice) for its taxable year 2003 (DKD's 2003 notice). On March 12, 2008, respondent issued to DKD a notice for its taxable years 2004 and 2005 (DKD's 2004 and 2005 notice).

In DKD's 2003 notice, respondent determined, inter alia, that DKD is not entitled to the following deductions claimed for 2003: (1) "Other expenses" of $69,515, (2) "Salaries & wages" of $7,700, (3) "Taxes and licenses" of $588, (4) "Rents" of $19,400, and (5) "Employee benefit programs" of $10,274. In that notice, respondent also determined that DKD is not entitled to a $20,000 deduction claimed for 2003 for "Pension, profit sharing plans" because

The corporation paid the shareholder's expenses for the operation of the cat breeding business. The disallowed

---

[40]As discussed above, DKD claimed a deduction in DKD's 2005 return for "Rents" of $22,800.

business expenses are not ordinary and necessary for the operation of the corporation's business. The business that the shareholder operated was determined to be a hobby and not operated for profit. The corporation's income increased, by the above amount [$20,000] for the tax year ending December 31, 2003 [sic].

In DKD's 2004 and 2005 notice, respondent determined, inter alia, that DKD is not entitled to the following deductions claimed for 2004: (1) Cattery expenses of $75,091, (2) "Salaries & Wages" of $7,700, (3) "Taxes & Licenses" of $588, and (4) "Rents" of $24,700, and (5) "Employee Benefit Programs" of $1,145. In that notice, respondent also determined, inter alia, that DKD is not entitled to the following deductions claimed for 2005: (1) "Meals & Entertainment" of $1,878, (2) "Telephone Expense" of $710, (3) "Advertising" of $1,240, (4) "Auto & Truck Expense" of $6,350, (5) "Travel Expenses" of $15,730, (6) "Miscellaneous Expenses" of $5,188, (7) "Utility Expenses" of $377, (8) "Entry Fees" of $5,363, (9) "Rental Cars" of $1,214, (10) "Veterinarian Bills" of $13,986, (11) "Litter Expense" of $1,923, (12) "Cat Food Expense" of $8,014, (13) "Photo Expenses" of $53, (14) "Stud Service Expense" of $800, (15) "Salaries & Wages" of $7,700, (16) "Taxes & Licenses" of $588, and (17) "Rents" of $22,800. In addition, respondent determined in DKD's 2004 and 2005 notice that DKD was a qualified personal service corporation, as defined in section 448(d)(2), for each of the years 2004 and 2005. In that notice, respondent also

determined that DKD is not entitled to the $20,000 deduction claimed for 2004 for "Pension & Profit Sharing"[41] because

> It is determined that pension and profit sharing expense is $0.00, rather than $20,000.00 for the taxable year ended December 31, 2004 because it has not been established that more than $0.00 was for an ordinary and necessary business expense, and expended for the purpose designated. Accordingly, taxable income is increased $20,000.00 for the taxable year ended December 31, 2004.

In DKD's 2004 and 2005 notice, respondent also determined that DKD is liable for its taxable years 2004 and 2005 for accuracy-related penalties under section 6662(a) in the respective amounts of $9,548 and $8,475.

Ms. Dursky

On September 26, 2007, March 12, 2008, and March 12, 2008, respectively, respondent issued to Ms. Dursky separate notices for her taxable year 2003 (Ms. Dursky's 2003 notice), her taxable year 2004 (Ms. Dursky's 2004 notice), and her taxable year 2005 (Ms. Dursky's 2005 notice).

In Ms. Dursky's 2003 notice, respondent determined that Ms. Dursky is required to include in gross income as constructive dividends the following deductions that DKD claimed in DKD's 2003

---

[41]As discussed above, DKD did not claim in DKD's 2004 return a deduction of $20,000 for "Pension, profit-sharing, etc., plans". DKD claimed in DKD's 2004 return a $20,000 deduction for "Dues and subscriptions". The record does not explain how respondent determined that the $20,000 that DKD claimed as a deduction for "Dues and subscriptions" in DKD's 2004 return was a $20,000 deduction for "Pension & Profit Sharing".

return and that respondent disallowed in DKD's 2003 notice:
(1) "Cattery expenses" of $69,515, (2) "Salaries and wages" of
$7,700, (3) "Taxes and licenses" of $588, (4) "Rents" of $19,400,
(5) "Pension, profit-sharing, etc., plans" of $20,000, and
(6) "Employee benefit programs" of $9,695.  In Ms. Dursky's 2003
notice, respondent also determined to (1) exclude from Ms.
Dursky's 2003 Schedule E the rental income of $19,400 that she
reported and (2) disallow the deductions of (a) "Mortgage
Expenses" of $1,555, (b) "Other Expenses" of $2,870, and
(c) "Depreciation Expense" of $641 that she claimed in the 2003
Schedule E with respect to Ms. Dursky's residence.

In Ms. Dursky's 2004 notice, respondent determined that Ms.
Dursky is required to include in gross income as constructive
dividends the following deductions that DKD claimed in DKD's 2004
return and that respondent disallowed in DKD's 2004 and 2005
notice:  (1) "Cattery expenses" of $75,091, (2) "Salaries and
wages" of $7,700, (3) "Taxes and licenses" of $588, (4) "Rents"
of $24,700, (5) "Pension" of $20,000,[42] and (6) "Employee benefit
programs" of $1,145.  In Ms. Dursky's 2004 notice, respondent
also determined to (1) exclude from Ms. Dursky's 2004 Schedule E
the rental income of $24,700 that she reported and (2) disallow
the deductions for (a) "Mortgage Interest" of $1,555, (b) "Taxes"
of $610, (c) "Other Expenses" of $730, and (d) "Depreciation" of

---

[42]See supra note 41.

$641 that she claimed in the 2004 Schedule E with respect to Ms. Dursky's residence.  In that notice, respondent also determined that Ms. Dursky is liable for her taxable year 2004 for an accuracy-related penalty under section 6662(a) of $3,280.60.

In Ms. Dursky's 2005 notice, respondent determined that Ms. Dursky is required to include in gross income as constructive dividends the following deductions that DKD claimed in DKD's 2005 return and that respondent disallowed in DKD's 2004 and 2005 notice:  (1) "Meals and entertainment" of $1,878, (2) "Telephone" of $710, (3) "Advertising" of $1,240, (4) "Automobiles" of $6,350, (5) "Travel" of $15,730, (6) "Miscellaneous" of $5,188, (7) "Utilities" of $377, (8) "Cat food" of $8,014, (9) "Entry fees" of $5,363, (10) "Rental car" of $1,214, (11) "Veterinarian" of $13,986, (12) "Litter" of $1,923, (13) "Stud Service" of $800, (14) "Photos" of $53, (15) "Salaries and wages" of $7,700, (16) "Taxes and licenses" of $588, and (17) "Rents" of $22,800. In Ms. Dursky's 2005 notice, respondent also determined to (1) exclude from Ms. Dursky's 2005 Schedule E the rental income of $12,000 that she reported and (2) disallow the deductions for (a) "Mortgage Interest" of $2,398, (b) "Taxes" of $1,343, and (c) "Depreciation" of $641 that she claimed in the 2005 Schedule E with respect to Ms. Dursky's residence.  In that notice, respondent also determined that Ms. Dursky is liable for her

taxable year 2005 for an accuracy-related penalty under section 6662(a) of $2,520.80.

## OPINION

DKD and Ms. Dursky bear the burden of proof with respect to the determinations which remain at issue in the respective notices that respondent issued to them. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are strictly a matter of legislative grace, and DKD and Ms. Dursky bear the burden of proving entitlement to any respective deductions that they claim. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Respondent bears the burden of proof with respect to any new matter. See Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 890 (1981).

Before turning to the issues presented, we shall comment on the respective testimonies of Ms. Dursky and Ms. Watkins, who were the only witnesses at the trial in these cases. We found those testimonies to be in certain material respects questionable, implausible, unpersuasive, uncorroborated, vague, and/or conclusory. We also found (1) the testimony of Ms. Dursky to be in certain material respects self-serving and (2) the testimony of Ms. Watkins to be in certain material respects serving the interests of Ms. Dursky, her personal partner, and DKD, the corporation that Ms. Dursky wholly owned. We shall not rely on the respective testimonies of Ms. Dursky and Ms. Watkins

to establish the respective positions of DKD and Ms. Dursky with respect to the issues to which those testimonies pertained.  See, e.g., <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

<u>Cattery Activity</u>

<u>DKD--Claimed Deductions</u>

It is the position of DKD that for the years at issue it is entitled to deduct under section 162(a) the following amounts relating to DKD's cattery activity:  (1) Respective reimbursed cattery expenses of $59,817, $64,920, $66,628; (2) purported salary of $7,700 paid to Ms. Watkins; (3) certain unidentified "taxes and licenses" of $588; and (4) purported rent of $4,333 paid to Ms. Dursky.[43]

Section 162(a) provides in pertinent part:

SEC. 162.  TRADE OR BUSINESS EXPENSES.

(a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

In order to be entitled for each of the years at issue to the deductions that it is claiming with respect to DKD's cattery activity, DKD must show that for each of those years that cattery activity constituted a trade or business of DKD within the meaning of section 162(a).  In order to establish that for each

---

[43]DKD conceded certain additional amounts that it claimed as deductions relating to DKD's cattery activity in its respective returns for the years at issue.

of the years at issue DKD's cattery activity constituted a trade or business of DKD within the meaning of section 162(a), DKD must show that during each of those years it had the intent or motive to make a profit from that activity. See Am. Props., Inc. v. Commissioner, 28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). As we explained in Am. Props., Inc., supra at 1111,

> The determination of whether the activities of a taxpayer constitute the carrying on of a trade or business requires an examination of facts in each case. Higgins v. Commissioner, 312 U.S. 212 [(1941)]. It has been held that whether an enterprise is conducted as a business for profit is a matter of intention and good faith, and all the facts in a particular case are to be considered. * * *

> Thus, the issues in the final analysis turn upon the question of whether during the years in question the petitioner and the corporation had the requisite intent or motive of making a profit. Intention is a question of fact to be determined not only from the direct testimony as to intent, but a consideration of all the evidence, including the conduct of the parties. The statement of an interested party of his intention and purpose is not necessarily conclusive. * * *

DKD contends that for each of the years at issue DKD's cattery activity constituted a trade or business within the meaning of section 162(a) because it conducted that activity during each of those years "In order to produce more income and a profit". On the record before us, we reject DKD's contention.

Since at least 1989 Ms. Watkins, and since at least 1994 Ms. Dursky, each was engaged in the hobby of operating a cattery from which each derived significant personal pleasure. At a time not

disclosed by the record before the years at issue, Ms. Dursky and Ms. Watkins became engaged in the hobby of jointly operating a cattery from which they continued to derive significant personal pleasure.  The cattery activity of Ms. Dursky and Ms. Watkins took place in Ms. Dursky's residence, except for attending cat shows and visiting veterinarians.  That cattery activity required them to spend substantial time and substantial money, including substantial time and substantial money spent by one or both of them in participating in certain competitions, clubs, and associations and traveling extensively to attend certain CFA[44] cat shows over much of the United States.  At least five of the cats of Ms. Dursky and Ms. Watkins won awards during certain competitions, at least two of their Norwegian Forest cats produced such outstanding offspring that they achieved the coveted title of CFA Distinguished Merit,[45] and the CFA designated the cattery activity of Ms. Dursky and Ms. Watkins as a "CFA Approved Cattery of Excellence."

At a time not disclosed by the record before the years at issue, Ms. Dursky and Ms. Watkins created a Web site that they

---

[44]The CFA is the largest association for owners of cats in the United States.

[45]The title of CFA Distinguished Merit was the highest award that the CFA presented to a breeding pedigreed cat.  At the time the CFA awarded the title of CFA Distinguished Merit to each of the two Norwegian Forest cats of Ms. Dursky and Ms. Watkins, fewer than ten Norwegian Forest cats throughout the world had been awarded that title.

maintained for their cattery activity.  At the time of the trial in these cases, the general public was able to access that Web site, although it had not been updated since 2002.  The cattery activity Web site stated:  "We treat our cats as members of our family" and "we have invested too much love in our wonderful kittens to risk exposing them to an uncertain and risky environment."  The cattery activity Web site advertised for sale two cats for $75 and $150, respectively, and two kittens for $200 and $400, respectively.

During the years at issue, DKD had a cattery activity, which was the cattery activity in which Ms. Dursky and Ms. Watkins had engaged before those years.  While operating DKD's cattery activity during the years at issue, Ms. Dursky and Ms. Watkins continued to engage in the same kinds of activities in which they had engaged before those years while operating the cattery activity of Ms. Dursky and Ms. Watkins.[46]  As was true while they were operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, Ms. Dursky and Ms. Watkins each continued to derive significant personal pleasure while operating DKD's cattery activity during the years at issue.

---

[46]During each of the years at issue, DKD used, without purchasing, the assets (e.g., cats, kittens, cat trees, feeding bowls, litter boxes) that Ms. Dursky and Ms. Watkins had used before those years in the cattery activity of Ms. Dursky and Ms. Watkins.  Starting sometime in 2004, while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity they began breeding, raising, offering for sale, and showing Abyssinian cats in addition to Norwegian Forest cats.

During the years at issue, while operating DKD's cattery activity Ms. Dursky and Ms. Watkins desired to expand on the national reputation that they had developed before those years while operating the cattery activity of Ms. Dursky and Ms. Watkins. In order to do so, they relied on their respective years of cattery activity experience and their respective reputations in the so-called cattery world.

As was true of the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, DKD's cattery activity was designated by the CFA during the years at issue as a "Cattery of Excellence".

As was true of their beliefs while operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity during the years at issue they believed that the price of any cat or kitten offered for sale would increase if the cats and kittens that they bred won national cat shows. While operating DKD's activity during the years at issue, Ms. Dursky and Ms. Watkins produced a total of four cats that won national championships.

As was true while they were operating the cattery activity of Ms. Dursky and Ms. Watkins before the years at issue, while Ms. Dursky and Ms. Watkins were operating DKD's cattery activity during the years at issue they continued to incur and pay

substantial expenses.  During the years at issue, DKD reimbursed Ms. Dursky and Ms. Watkins for those substantial expenses and claimed deductions for those reimbursed expenses and for certain other claimed expenses in its respective tax returns for those years.[47]

While operating DKD's cattery activity during 2003, Ms. Dursky and Ms. Watkins produced approximately seven to nine kittens from approximately five to seven litters.  While operating DKD's activities during each of the years 2004 and 2005, Ms. Dursky and Ms. Watkins produced approximately nine kittens from approximately three litters.

During 2003, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity.  During 2004, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity except for three cats and/or kittens that they sold in December of that year for a total of $250.  During 2005, Ms. Dursky and Ms. Watkins did not sell any cats or kittens while operating DKD's cattery activity

---

[47]In DKD's 2003 return, DKD claimed deductions for cattery expenses of $69,515 and for purported salary of $7,700, "Taxes and licenses" of $588, and purported rent of $12,000 relating to DKD's cattery activity.  In DKD's 2004 return, DKD claimed deductions for cattery expenses of $75,091 and for purported salary of $7,700, "Taxes and licenses" of $588, and purported rent of $12,000 relating to DKD's cattery activity.  In DKD's 2005 return, DKD claimed deductions for cattery expenses of $60,540 and for purported salary of $7,700, "Taxes and licenses" of $588, and purported rent of $12,000 relating to DKD's cattery activity.  See supra note 43.

except for a total of eight cats and/or kittens that they sold in June, July, August, October, and November of that year for a total of $1,525.

In 2006, at an undisclosed time in or before August, Mr. Musin and Ms. Schwartz, the tax return preparers for DKD and/or Ms. Dursky,[48] informed them that the IRS was investigating Mr. Musin and Ms. Schwartz and intended to commence an examination of petitioners' respective tax returns for 2003 and 2004. As a result, around August 2006, (1) Ms. Dursky and Ms. Watkins discontinued operating DKD's cattery activity,[49] (2) Ms. Dursky and Ms. Watkins continued operating that cattery activity as the cattery activity of Ms. Dursky and Ms. Watkins, and (3) Ms. Dursky and DKD retained Mr. Monroe.[50]

Except for the respective testimonies of Ms. Dursky and Ms. Watkins, on which we are unwilling to rely, there is no reliable evidence in the record to support our finding that during each of

---

[48]See supra note 14.

[49]Although Ms. Dursky and Ms. Watkins did not discontinue operating DKD's cattery activity until around August 2006, DKD did not claim any deductions relating to DKD's cattery activity in the tax return that it filed for its taxable year 2006.

[50]See supra note 19.

the years at issue DKD intended to make a profit from DKD's cattery activity.[51]

Based upon our examination of the entire record before us, we find that DKD has failed to carry its burden of establishing that during each of the years at issue it intended to make a profit from DKD's cattery activity. On that record, we find that during each of the years at issue DKD expended substantial amounts in DKD's cattery activity for the personal pleasure of Ms. Dursky, its sole stockholder, and with the expectation that it would be able to deduct those substantial amounts for each of those years. On the record before us, we further find that during each of the years at issue DKD's cattery activity was incident to the personal hobby of Ms. Dursky, DKD's sole stockholder, who before, during, and after those years derived significant personal pleasure from the cattery activity in which she was involved.

Based upon our examination of the entire record before us, we find that DKD has failed to carry its burden of establishing that for each of the years at issue DKD's cattery activity constituted a trade or business of DKD within the meaning of

---

[51]For example, the record does not contain reliable evidence of a business plan for DKD that described specifically what steps Ms. Dursky, DKD's sole stockholder and sole officer, intended to take during the years at issue in an attempt to increase significantly revenues and/or to reduce significantly expenses in order to generate a profit for DKD from DKD's cattery activity.

section 162(a).  On that record, we further find that DKD has failed to carry its burden of establishing that for each of the years at issue it is entitled under section 162(a) to deduct with respect to DKD's cattery:  (1) Amounts reimbursed to Ms. Dursky and Ms. Watkins, (2) amounts paid to Ms. Watkins as purported salary, (3) amounts paid for certain "taxes and licenses", and (4) amounts paid to Ms. Dursky as purported rent.

### Ms. Dursky--Claimed Constructive Dividends

We have found that during each of the years at issue DKD expended substantial amounts in DKD's cattery activity for the personal pleasure of Ms. Dursky, its sole stockholder, and that during each of those years that activity was incident to the personal hobby of Ms. Dursky.  On the record before us, we find that for each of the years at issue Ms. Dursky is required to include in gross income as constructive dividends the amounts of deductions relating to DKD's cattery activity that DKD claimed for each of those years and that we have disallowed.[52]

### Ms. Dursky--Claimed Cattery Activity Deductions

It is the alternative position of Ms. Dursky that

> If this Court finds that the cattery operation was
> operated by Debra Dursky and not DKD Enterprises, which
> is contrary to the stipulation between the parties,
> then Debra Dursky should be allowed to deduct the

---

[52]Petitioners do not dispute that for each of the years at issue DKD had earnings and profits that were at least equal to the amount of constructive dividends that we have found Ms. Dursky has for each of those years.

cattery expenses under I.R.C. §162, since the cattery
was operated for a profit.

In holding that DKD is not entitled for each of the years at
issue to deduct under section 162(a) the various deductions that
it is claiming with respect to DKD's cattery activity, we did not
find that "the cattery operation was operated by Debra Dursky and
not DKD Enterprises".  Instead, we found that DKD failed to carry
its burden of establishing (1) that during each of the years at
issue DKD intended to make a profit from DKD's cattery activity
and (2) that for each of those years DKD's cattery activity
constituted a trade or business of DKD within the meaning of
section 162(a).  Thus, the premise on which Ms. Dursky advances
her alternative position is not valid.[53]

On the record before us, we find that for each of the years
at issue Ms. Dursky is not entitled to deduct under section
162(a) the deductions relating to DKD's cattery activity that DKD
is claiming for each of those years and that we have disallowed.

Ms. Dursky--Claimed Schedule E Deductions

It is the position of Ms. Dursky that she is entitled for
each of the years at issue to deduct in Schedule E the respective

---

[53]Even if the premise on which Ms. Dursky advances her
alternative position were valid, on the record before us, we
would nonetheless reject that position.  If that premise were
valid, on the record before us, we would find under sec. 183 and
the regulations thereunder that for each of the years at issue
Ms. Dursky is not entitled to deduct the amounts that DKD is
claiming as deductions for each of those years with respect to
DKD's cattery activity and that we have disallowed.

portions of the mortgage interest and real estate tax that she paid with respect to Ms. Dursky's residence that are allocable to DKD's purported rental of a portion of that residence for DKD's cattery activity.

We have found that DKD failed to carry its burden of establishing (1) that for each of the years at issue DKD's cattery activity constituted a trade or business of DKD within the meaning of section 162(a) and (2) that for each of those years DKD is entitled to deduct under that section any amounts that it claimed as rent for the portion of Ms. Dursky's residence where Ms. Dursky and Ms. Watkins operated DKD's cattery activity.[54]

On the record before us, we find that Ms. Dursky has failed to carry her burden of establishing that for each of the years at issue she is entitled to deduct in Schedule E the respective portions of mortgage interest and real estate tax that she paid with respect to Ms. Dursky's residence that are allocable to

---

[54]Although respondent determined that Ms. Dursky does not have rental income for each of the years at issue attributable to the purported rent that DKD is claiming as a deduction for each of those years and that we have disallowed, we have held that for each of the years at issue Ms. Dursky is required to include in gross income as constructive dividends that disallowed purported rent.

DKD's purported rental of that residence for DKD's cattery activity.[55]

## Qualified Personal Service Corporation

It is the position of DKD that it is not a qualified personal service corporation, as defined in section 448(d)(2), for each of the years 2004 and 2005 that is subject to the 35-percent tax rate prescribed in section 11(b)(2).[56]

Section 448(d)(2) defines the term "qualified personal service corporation" to mean:

> SEC. 448(d). Definitions and Special Rules.--For purposes of this section--
>
> *      *      *      *      *      *      *
>
> (2) Qualified personal service corporation.-- The term "qualified personal service corporation" means any corporation--
>
> > (A) substantially all of the activities of which involve the performance of services in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, or consulting, and

---

[55]Respondent determined that for each of the years at issue Ms. Dursky is entitled to deduct in Schedule A the respective amounts of mortgage interest and real estate tax that she paid and that she claimed in Schedule E for each of those years and that we have disallowed.

[56]Respondent determined in DKD's 2004 and 2005 notice that DKD is a qualified personal service corporation for each of the years 2004 and 2005. Respondent did not make any such determination in DKD's 2003 notice. Respondent argues on brief that DKD also is a qualified personal service corporation for 2003. Therefore, respondent has the burden of establishing that DKD is a qualified personal service corporation for 2003.

(B) substantially all of the stock of which (by value) is held directly (or indirectly through 1 or more partnerships, S corporations, or qualified personal service corporations not described in paragraph (2) or (3) of subsection (a)) by--

(i) employees performing services for such corporation in connection with the activities involving a field referred to in subparagraph (A),

Section 1.448-1T(e)(3), Temporary Income Tax Regs., 52 Fed. Reg. 22768 (June 16, 1987), provides in pertinent part:

(3) Meaning of qualified personal service corporation. For purposes of this section, the term "qualified personal service corporation" means any corporation that meets--

(i) The function test of paragraph (e)(4) of this section, and

(ii) The ownership test of paragraph (e)(5) of this section.

Section 1.448-1T(e)(4), Temporary Income Tax Regs., supra, provides in pertinent part that the function test is met "if 95 percent or more of the time spent by employees of the corporation, serving in their capacity as such, is devoted to the performance of services" in, inter alia, consulting. Section 1.448-1T(e)(5)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 22770 (June 16, 1987), provides in pertinent part that a corporation "meets the ownership test, if at all times during the taxable year, substantially all the corporation's stock, by value, is held, directly or indirectly, by" employees who perform

services for the corporation in connection with activities involving the performance of services in, inter alia, consulting.

We have found that Ms. Dursky, the only stockholder of DKD and the only employee of DKD who performed consulting services for it, spent approximately 2,000 hours during the year 2003 and approximately 2,200 hours during each of the years 2004 and 2005 working for DKD in its IT consulting business. We have also found that during each of the years 2003, 2004, and 2005 Ms. Dursky spent approximately 800 hours operating DKD's cattery activity.[57]

On the record before us, we find that during each of the years 2003, 2004, and 2005 Ms. Dursky did not spend 95 percent or more of her time while working for DKD performing consulting services for it. On that record, we further find that for each of the years at issue DKD is not a qualified personal service corporation, as defined in section 448(d)(2), that is subject to the 35-percent tax rate prescribed in section 11(b)(2).

DKD Fidelity Profit-Sharing Plan

DKD--Claimed Deductions

---

[57]We have found that during each of the years at issue Ms. Watkins spent more hours than Ms. Dursky operating DKD's cattery activity. We have not found the precise number of hours that Ms. Watkins spent during each of those years operating that activity because we are unwilling to rely on her testimony in that respect.

It is the position of DKD that it is entitled to deduct (1) for 2003 a $10,000 contribution under the DKD Fidelity profit-sharing plan that it made on April 14, 2004, by sending a $10,000 check to Fidelity; (2) for 2004 a total of $20,000 of contributions that it made under that profit-sharing plan by sending a $10,000 check to Fidelity on December 27, 2004, and a $10,000 check to Fidelity on April 11, 2005; and (3) for 2005 a $5,000 contribution that it made under that profit-sharing plan by sending a $5,000 check to Fidelity on April 10, 2006.[58]

It is the position of respondent that for each of the years at issue DKD is not entitled to the deduction that DKD is claiming for DKD's contributions under the DKD Fidelity profit-sharing plan. In support of respondent's position, respondent asserts in pertinent part:

---

[58]In DKD's 2003 return, DKD claimed a deduction for the $10,000 contribution under the DKD Fidelity profit-sharing plan that it is claiming here. In DKD's 2004 return, DKD did not claim a deduction of $20,000 for contributions under that plan. It did, however, claim in that return a $20,000 deduction for "Dues and subscriptions". Respondent determined that the $20,000 that DKD claimed in DKD's 2004 return for "Dues and subscriptions" was a $20,000 deduction claimed for contributions under the DKD Fidelity profit-sharing plan. The record does not explain how respondent made that determination, see supra note 41, but DKD does not dispute it. In DKD's 2005 return, DKD did not claim a deduction for a $5,000 contribution under the DKD Fidelity profit-sharing plan. DKD claims for the first time here a deduction for 2005 for a $5,000 contribution that it made under the DKD Fidelity profit-sharing plan by sending a $5,000 check to Fidelity on Apr. 10, 2006. Thus, DKD has the burden of proof with respect to that claimed deduction for 2005.

If [Ms.] Watkins is determined to have been an employee of the cattery, then the failure to include [Ms.] Watkins in DKD's pension plan is a fatal flaw. A qualified pension plan cannot discriminate in favor of highly compensated employees. I.R.C. § 401(a)(4). "Highly compensated employee" is defined in I.R.C. § 414(q) as a [sic] employee who was a 5 percent owner at any time during the year or preceding year or was in the top-paid group of employees. As the sole shareholder of DKD, [Ms.] Dursky qualifies as a "highly compensated employee." [Ms.] Dursky and [Ms.] Watkins were both employees. DKD did not offer, or pay, [Ms.] Watkins any pension benefits. The purported pension plan is not, therefore, a qualified pension plan and no pension contributions should be allowed.

DKD counters that the reason stated in DKD's 2003 notice and in DKD's 2004 and 2005 notice for respondent's determinations that DKD is not entitled for the years 2003 and 2004 to the deductions that it claimed in its respective tax returns for those years for contributions under the DKD Fidelity profit-sharing plan was that those contributions are not "ordinary and necessary" expenses. As a result, DKD argues that respondent has the burden of proving that the DKD Fidelity profit-sharing plan did not include Ms. Watkins as a participant. According to DKD, "Respondent presented no evidence, at trial or otherwise, regarding who were the participants in the [DKD] Fidelity pension [sic] plan."

We reject DKD's contention about what the record establishes "regarding who were the participants in the [DKD] Fidelity pension [sic] plan." The Fidelity contribution document that Ms. Dursky executed on behalf of DKD on December 28, 2001, indicated

that the only participant under the DKD Fidelity profit-sharing plan was Ms. Dursky.  Moreover, petitioners have taken the position at trial and on brief that Ms. Dursky was an employee of DKD during each of the years at issue.[59]

On the record before us, we find that for each of the years at issue the DKD Fidelity profit-sharing plan discriminated in favor of Ms. Dursky, DKD's sole stockholder, who was a "highly compensated employee" as defined in section 414(q).  On that record, we further find that for each of the years at issue the DKD Fidelity profit-sharing plan did not constitute a qualified profit-sharing plan under section 401(a).  On the record before us, we find that for each of the years at issue DKD is not entitled to a deduction for any contributions made under the DKD Fidelity profit-sharing plan.[60]

Ms. Dursky--Claimed Constructive Dividends

We have found that for each of the years at issue DKD is not entitled to deduct any contributions made under the DKD Fidelity

[59]For each of the years at issue, DKD issued Form W-2 to Ms. Watkins, in which it reported that it paid her wages of $7,700. For each of those years, Ms. Watkins filed Form 1040, in which she included in gross income the $7,700 that she had received from DKD during each such year.

[60]In the light of our holding, we need not address respondent's alternative argument that if the DKD Fidelity profit-sharing plan were to constitute a qualified profit-sharing plan under sec. 401(a), DKD would be entitled to deduct for each year at issue only the contributions that it made under that plan during each such year.

profit-sharing plan.  On the record before us, we find that any respective contributions that DKD made under that plan and claimed as deductions in its respective tax returns for the years at issue and that we have disallowed are required to be included in Ms. Dursky's income as constructive dividends for her respective taxable years at issue in which DKD made those contributions.[61]

Ms. Dursky's Health Insurance Policy

DKD--Claimed Deductions

It is DKD's position that for each of the years at issue it is entitled to deduct certain premiums that it paid on a health insurance policy issued in Ms. Dursky's name that she had purchased.[62]  In support of DKD's position, DKD asserts:

> An employer is entitled to deduct, as ordinary and necessary trade or business expense, medical insurance premiums it paid for its employees.  I.R.C. § 162(a).

>      *      *      *      *      *      *      *

---

[61]See supra notes 52 and 58.

[62]In petitioners' opening brief, petitioners state that DKD paid in 2003 and 2004, respectively, and is entitled to deduct for those years the respective premiums of $6,950 and $7,651 on Ms. Dursky's health insurance policy.  In petitioners' reply brief, petitioners claim that, in addition to those claimed respective deductions for 2003 and 2004, it is entitled to deduct for 2005 $7,651 of health insurance premiums that it paid in that year on Ms. Dursky's health insurance policy.  We have found that during 2003 and 2004 DKD paid premiums on Ms. Dursky's health insurance policy totaling $6,950.10 and $7,651.50, respectively.  We have not found that DKD paid any premiums on that policy during 2005.

Since DKD Enterprises paid medical insurance premiums on a medical insurance policy for its employee, Debra Dursky, DKD Enterprises is entitled to deduct the medical insurance premiums as ordinary and necessary business expenses under I.R.C. § 162(a).

It is respondent's position that DKD is not entitled to the deductions that it is claiming for the premiums that it paid on Ms. Dursky's health insurance policy.[63] In support of respondent's position, respondent asserts in respondent's reply brief:

the medical insurance premiums paid by DKD [on Ms. Dursky's health insurance policy] were not made pursuant to an accident or health plan as required by I.R.C. § 106(a). DKD never had an accident or health insurance plan. DKD simply wrote checks to a health insurer, allegedly on behalf of [Ms.] Dursky.

Also, I.R.C. § 105 states that amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributed to contributions by the employer which were not includible in the gross income of the employee or (2) are paid by the employer. [Ms.] Dursky did not include the health insurance premiums as compensation.

Section 162(a) permits a taxpayer to deduct all the ordinary

---

[63]In petitioners' reply brief, petitioners argue that respondent conceded in respondent's opening brief that DKD is entitled to deduct for the years at issue any respective premiums that it paid on Ms. Dursky's health insurance policy. We disagree. Although respondent did not offer any reason in respondent's opening brief in support of respondent's position that DKD is not entitled to deduct those premiums, we conclude that respondent did not concede that issue in that brief. Respondent explained in respondent's reply brief, which we quote in pertinent part in the text, why respondent believes that DKD is not entitled to deduct for each of the years at issue any premiums that it paid on Ms. Dursky's health insurance policy.

and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.  Sec. 162(a)(1).  Section 1.162-10, Income Tax Regs., provides in pertinent part with respect to "Certain employee benefits" as follows:

> Amounts paid or accrued within the taxable year for * * * a sickness, accident, hospitalization, medical expense, * * * or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. * * *

In Waterfall Farms, Inc. v. Commissioner, T.C. Memo. 2003-327, we held:

> When payments for medical care are properly excludable from an employee's income [under section 105 and/or 106] because they are made under a "plan for employees," they are deductible by the employer as ordinary and necessary business expenses under section 162(a). * * *

Based upon our examination of the entire record before us, we find that DKD has failed to carry its burden of establishing that it had in effect during any of the years at issue a sickness, hospitalization, medical expense, or similar benefit plan for employees.  On that record, we find that DKD has failed to carry its burden of establishing that for each of the years at issue it is entitled to deduct any premiums that it paid on Ms. Dursky's health insurance policy.

Ms. Dursky--Claimed Exclusion from Income

It is the position of Ms. Dursky that she is entitled to exclude under section 105 or 106 the premiums that she claims DKD paid during each of the years at issue on Ms. Dursky's health insurance policy.[64] We have found that DKD has failed to carry DKD's burden of establishing that during each of the years at issue it had in effect a sickness, hospitalization, medical expense, or similar plan for employees. On the record before us, we find that Ms. Dursky is not entitled for any of the years at issue to exclude from gross income under section 105 or 106 the amount of any premiums that DKD paid on Ms. Dursky's health insurance policy.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing, the concessions of respondent, and the concessions of petitioners,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[64]See <u>supra</u> note 62.